WEBBER *v.* WEBBER.

1. MORTGAGE — PRINCIPAL AND SURETY — FRAUDULENT CONVEYANCES.

A mortgage given to the brothers of the mortgagor to secure a bona fide indebtedness upon which the mortgagor was liable as surety for his son is not rendered fraudulent by the fact that it was within the contemplation of the parties that other creditors of the mortgagor might thereby be delayed or defeated in the enforcement of their demands.

2. SAME—RIGHTS OF CREDITORS OF SURETY.

Creditors of a surety who has mortgaged his property to secure the liability created by his contract of suretyship cannot compel the secured creditor to exhaust his remedy against the principal before selling the mortgaged premises.

3. SAME—DUTY AS TO PAYMENT OF DEBT.

Where it is fairly established by the evidence that a mortgagor was indebted to his son in a considerable amount, that the mortgage in question was given to secure a note made by a firm of which the son was a member, and indorsed by the father, and that the latter subsequently agreed to pay the note upon the understanding that the son was to repay any difference between the amount so paid and the father's indebtedness to him, equity will not, at the instance of the mortgagor's creditors, compel the makers of the note to satisfy the mortgage, it being clear that the mortgaged property became, in pursuance of such agreement, the primary fund out of which the debt should be realized.

4. SAME—SUBROGATION.

Creditors holding liens on property of their debtor mortgaged by him to secure his liability as surety for another, to whom he was indebted in a less sum than that represented by the mortgage, are, in the order of the priority of their liens, entitled to be subrogated to the rights of the mortgagor surety to the extent that the amount realized on foreclosure sale shall exceed the surety's indebtedness to his principal.

5. EQUITY PRACTICE—COSTS.

Under Chancery Rule No. 90, where several defendants are entitled to costs, the same are apportioned among them; and,

by analogy, where a complainant prevails against several defendants, he should be awarded single costs only.

6. INSOLVENT DEBTORS—NECESSITY FOR LEGISLATION.
   The necessity for a bankrupt or insolvency law, whereby a uniform distribution of the assets of an insolvent debtor may be secured, is emphasized.

Appeal from Kent; Adsit, J. Submitted January 31, 1896. Decided April 21, 1896.

Bill by George W. Webber and Andrew J. Webber against Oscar Webber and others to foreclose a mortgage. From a decree for complainants, certain of the defendants appeal. Modified and affirmed.

*William O. Webster* (*J. W. Champlin*, of counsel), for complainants.

*T. J. O'Brien* and *James H. Campbell*, for appellant George F. Beardsley.

*Clute & Clute*, for appellant Jacob Neff.

*N. O. Griswold*, for appellant Payne Knight.

*W. W. Mitchel* (*George E. Nichols*, of counsel), for Joseph T. Webber, defendant and appellee.

MONTGOMERY, J. The complainants filed their bill to foreclose a mortgage upon property in the city of Ionia, consisting of four parcels of real estate, the cost price of which was about $20,700, to secure the payment of a note of $14,500, given by the defendants Joseph T. Webber and Thomas R. Buck, June 30, 1893, and due December 31, 1893, and indorsed and guaranteed by Oscar Webber. The mortgage was given July 14, 1893, by Oscar Webber alone, his wife not joining. The defendants George F. Beardsley, Payne Knight, Lorenzo A. Corey, and Jacob Neff were made parties as subsequent incumbrancers, they having, after the execution of the mortgage, caused levies to be made upon the property as the property of Oscar Webber. Thereupon the defendants filed cross-bills, or answers in the nature of a cross-bill, set-

ting up that Oscar Webber was indebted to them in various sums, and that they had each caused a levy to be made on the mortgaged property; that Oscar Webber was insolvent; and that the mortgage in question was given with a fraudulent purpose of defeating the creditors of Oscar Webber in their efforts to collect their claims, and was being foreclosed with that purpose.

The case as it is presented in this court presents three questions:

*First.* Was the mortgage given to complainants by Oscar Webber fraudulent in its inception?

*Second.* If not, was it given under such circumstances, or has it been so dealt with by complainants, as to make it inequitable for them to resort to the mortgage security before they have proceeded against the makers of the note; or can the court protect these lienholders to any extent because the liability of Oscar Webber is only secondary, and because Webber & Buck, the makers of the note, should in equity and good conscience pay the note?

And, *third*, if the court should be of the opinion that there is power to compel resort to Webber & Buck, have they shown counter equities which limit the result?

The circuit judge granted a decree of foreclosure, and provided for no remedy against Webber & Buck, so that his determination must have been based upon a negative finding as to the first two questions. We will consider the questions separately so far as practicable, and in their order.

1. It appears that Joseph T. Webber (of Webber & Buck) is the son of Oscar Webber, and on the occasion of his engaging in business, in 1886, Oscar Webber, then apparently, and probably in fact, a man of considerable means, undertook to indorse and guarantee the paper of the firm to be from time to time given to Webber Bros., composed of complainants, who are brothers of Oscar Webber; that the purpose of this arrangement was not to enable Webber & Buck to make a temporary loan, but to furnish capital, the expectation being that the loan was

to be renewed from time to time, as it in fact was, and apparently increased or diminished as the necessities of Webber & Buck demanded. The $14,500 note secured by the mortgage here in question was given in the regular course of the business, and is beyond all question *bona fide*, representing on its face actual indebtedness of Webber & Buck, guaranteed by Oscar Webber. So far as complainants knew, Oscar Webber was a surety merely, and such, we think from the evidence, he was in fact.

Oscar Webber had, prior to December, 1892, been a member of the banking firm of Webber & Chapin, doing business at Stanton. On the 28th of December, 1892, this copartnership was dissolved, Mr. Chapin buying the interest of Webber, and agreeing to pay him $6,000 therefor in monthly installments, and agreeing to pay the indebtedness of the firm. At this time there were liabilities on certificates and to other creditors of the bank of about $150,000, and on the face of the books an apparent surplus of $23,000. Chapin continued the business until July, 1893, paying to Webber $3,000 of the indebtedness, and reducing the deposit accounts upon which Webber was liable to about $28,000. At about this date Oscar Webber went to Stanton, and sought to obtain security, but this was refused him, and he returned to Ionia, and saw the complainant George W. Webber on the same day. George asked him how Chapin was getting along, and how much of the paper Oscar was now liable on, and, on hearing that Chapin was turning out paper to the creditors of the bank, and that Oscar was liable on about $30,000 of the bank debts, asked him to pay the note. Oscar said he could not do that, but would secure it, and the mortgage was thereupon given.

We discover nothing in this transaction up to this time either unnatural or unusual. We find the creditor demanding from his debtor security, and receiving it, and while it must have been in the contemplation of both that in case of disaster to Chapin & Co., resulting in their failure to care for the obligations of Webber & Chapin, this security

would work preference in favor of Webber Bros., yet under the rule of the common law, which protects the vigilant, this security is protected. *Olmstead* v. *Mattison*, 45 Mich. 617; *Sheldon* v. *Mann*, 85 Mich. 265; *Hill* v. *Bowman*, 35 Mich. 191. The transaction does suggest anew the pressing necessity of a bankrupt or insolvency law which shall afford some protection to the less greedy and importunate creditors, and which shall render it no longer possible for a debtor in failing circumstances to prefer members of his own immediate family. But the case is not peculiar in this. Such object lessons are so often presented that it seems impossible that the attention of legislative bodies will or can be for much longer diverted from the crying need of reform in this respect. But until there is some legislation which prohibits preference, and provides for a uniform distribution of the assets of an insolvent debtor, the creditor must be accorded the right, which he undoubtedly has under the common law, of taking security, even though the effect may be to delay or defeat a less diligent creditor.

2. The appealing defendants are, then, subsequent lienholders, and the question is presented as to whether as such they can insist that complainants shall resort to their action against Webber & Buck before selling the mortgaged property. In 1 Brandt on Suretyship and Guaranty (2d Ed.), § 238, it is said:

"It is settled by a long-continued and unvarying current of authority that the surety may by a suit in chancery, after the debt becomes due, and before he pays it, compel the creditor to proceed to collect the debt from the principal, provided he indemnify the creditor."

The cases cited to sustain the text, and the cases generally which sustain the doctrine, are cases in which the creditor holds no security for the debt, either from the principal debtor or his surety. But we think it is not the rule that, when a surety has given security for the payment of a debt, he may compel the creditor to resort to action against the principal, and postpone the enforcement

of his claim by resort to the security. This would be going directly against the terms of the contract. The right which the surety has is to be subrogated to the claim against the principal upon payment of the debt. Colebrooke, Collat. Sec. § 215; *McElroy* v. *Hatheway*, 44 Mich. 399.

The doctrine of marshaling securities does not aid the complainants, as it is an essential precedent condition that there be two funds which may be resorted to by the creditor, and the naked promise of the debtor has not, we think, been regarded as a fund in such sense that the creditor may be compelled to resort to suit and levy on property before resorting to property specifically dedicated to the payment of the debt. *Wolf* v. *Smith*, 36 Iowa, 454.

The right of Oscar Webber before the levy by the defendants was to discharge this debt, and resort to action against Webber & Buck for the whole or such portion of the debt as Webber & Buck were bound to pay. He would also have this right if his property went to pay the debt of Webber & Buck; and we think it clear that the defendants, having acquired liens upon the property of Oscar Webber, would be subrogated to his right to the extent of this lien. 1 Story, Eq. Jur. § 563; *Foy* v. *Sinclair*, 93 Tenn. 296.

3. This brings us to the question which is the principal one in controversy in this case, viz., whether Webber & Buck or Oscar Webber should in equity pay this mortgage.

There is no question that, when the note was given to complainants, it was the note of Webber & Buck, with Oscar Webber as guarantor of payment. It is now claimed by Joseph T. Webber that his father, Oscar Webber, was indebted to him in the sum of $12,625, and that, after the mortgage in question was given, he asked his father how he, Joseph, was to receive his pay, and that his father agreed to pay the $14,500 note to complainants upon the understanding that he (Joseph) was to

repay him any difference between what was due from his father to him, and the amount of the indebtedness to complainants. If this claim is sustained by the proofs, and such an arrangement was in·fact made, there can be no question that, in equity, this mortgaged property became the primary fund out of which this debt might and should be realized, not only as between Oscar Webber and complainants, but as between Joseph and the creditors of Oscar.

The question of fact involved has given us no little difficulty, and the conclusion we have reached after the most careful consideration does not rest upon the absolute faith in the correctness of our conclusion which we would like to feel in all cases. We have not had the witnesses before us, and can only judge of their credibility by what appears in the record of the case. The two defendants Oscar and Joseph Webber were called by the appealing defendants, and gave testimony which, if true, fully established a liability of Oscar to Joseph on account of money held in trust for many years, and left in control of Oscar by his wife, the mother of Joseph. There are circumstances which cast suspicion upon the transaction, and create some doubt; the chief one being the long delay in paying over this fund, although there have been times when Oscar could have done so without inconvenience, and when the fund would have been very useful to Joseph, who was, during much of the time, borrowing money to do business with, and this on his father's indorsement. On the other hand, this is explained by saying that this fact of the indebtedness of Oscar to Joseph furnished the reason for the indorsement. Without enlarging upon the circumstances, which cannot be of interest in other cases, we have determined upon the whole case that the indebtedness from Oscar to Joseph is fairly made out.

The decree of the circuit court should be modified in two particulars: First, the defendants holding liens are entitled, in order of priority, to be subrogated to the claim

of Oscar Webber to the extent that the amount realized on the sale of the mortgaged premises should exceed the amount of Oscar's indebtedness to Joseph; and we think complainants' costs in the court below should be limited to single costs. Under Chancery Rule No. 90, if the defendants had prevailed, the costs would have been apportioned, and we see no reason why complainants should be entitled, when they prevail, to more than single costs. No costs will be awarded to either party in this court.

LONG, C. J., and MOORE, J., concurred with MONTGOMERY, J. HOOKER, J., did not sit.

GRANT, J. I concur in the opinion of my Brother MONTGOMERY, except that portion of it referring to the necessity of a bankrupt law, and as to that I express no opinion.